Good morning, Your Honor. If it pleases the Court, my name is Stephen Volker. I'm a lawyer representing the Plaintiff and Appellant Western Watersheds Project. We're here today on review of a summary judgment decision by the trial court. As the Court knows, the standard of review is de novo. We raise five issues, all sound under NEPA. In brief, we established below and argue on appeal that the defendant, Bureau of Land Management, failed to take a hard look at this project's impacts on desert tortoises. Secondly, we argue that the trial court erred in not requiring BLM to prepare a supplemental or subsequent EIS. It looked like the main difficulty here was counting tortoises. One problem you have with them is they hide in burrows instead of coming out at roll call and standing in line to be counted. So it was acknowledged in the environmental impact statement that they're hard to count. It looked like your figures, you didn't just count turtles, you counted eggs. It's kind of like counting chickens by going to the grocery store and looking at the packages of eggs. I don't see why they didn't try hard enough to count tortoises. I agree that the government could have tried much harder to count the tortoises. 90% of tortoises are less than 15 to 20 years of age, which is when they become capable of reproduction. Most juveniles don't survive anyway. They're going to die whether there's a project out there or not in huge numbers. They're not going to make this adult age where they can procreate, right? It's true that about 90% of hatchlings die before they reach reproductive age. Looked differently. That's an important argument for why every juvenile should be protected to give it an opportunity to reach reproductive age. But the fact here is it's undisputed that when the land was cleared, the eggs and juveniles were eliminated. I think you counted eggs too, so 90% of hatchlings. Is that a right of conception or when they're actually hatched? These are figures provided by the Fish and Wildlife Service in its 2011 biological opinion. So it felt it important to... I don't have that information. Well, you gave a number for eggs to show that the government was way off in its count. And if 90% of the hatchlings die before reaching reproductive age, it means a considerably higher percentage. But I don't know what percentage. That's why I asked you. I may have... Eggs don't result in breeding adults. I think the point here is that all of them, regardless of whether they're eggs or hatchlings or juveniles, less than, let's say, 160 millimeters, were destroyed when the project was cleared. This is a significant impact because this represents... ...considerably after the project that suggests a higher number. I don't know if that's because the government miscounted or because your counting methodology is different from theirs or if it's because something about the project damaged predators so that more tortoises were surviving instead of fewer tortoises surviving. I can't tell from this record. Well, the record makes clear that it's not our count. We did not count the tortoises. Yeah, you had some expert you tried to get in who had a higher number. That's incorrect, Your Honor. These are the figures provided by the Fish and Wildlife Service. It calculated in its June 2011 biological opinion that upwards of 1,136 juveniles, hatchlings, and eggs were destroyed, representing 15 to 20 years of regenerative capability. This means that after the current adult, surviving adults, most of which were killed in the clearing process, upwards of 139 were killed according to the Fish and Wildlife Service. Of those, they will expire, that is, die from normal mortality within 10 to 15 years after they reach maturity since they reach maturity at 15 to 20 years and they live 25 to 35 years. So if you eliminate all the age classes below 15 years, for example, then you are eliminating the reproductive capability for a long period of time, 15 years. You may cause, in fact, that distinct population that occupied the North Ivanpah Valley, which according to the information we have is unusual in that that's the highest elevation population of desert tortoises in California. That's significant because with global warming, the ability of tortoises to survive at lower elevations is in serious doubt. And so the record is really without dispute that this is a unique population and it's a unique habitat and its elimination could hold significance for the survival of not only the North Ivanpah Valley population, but the Northeast Mojave Recovery Unit population, which is one of six recovery units, and indeed the entire population of the state as global warming proceeds over time. Now the point I wanted to move on to was that the government simply didn't do a count. It represented in the EIS that there were up to 50 tortoises. It did not indicate that did not include juveniles. And the public had raised serious concerns about whether this was an important desert tortoise habitat and its elimination in favor of this particular project would pose significant impacts on desert tortoises. But they were assured in the EIS that the number of tortoises that would be affected would be up to 50. Later, when the clearing process commenced and an appropriate site-specific survey was taken of the number of tortoises, it was learned in the early months of 2011, as documented in the BLM April 2011 biological assessment and later the June 2011 Fish and Wildlife Service second biological opinion, that the number of tortoises on site was considerably greater and all were being lost. Now this is significant now for two reasons. One, because the true nature of the impacts of this project on a threatened species were not disclosed and later it was determined that there were far more grave impacts on that species, it was incumbent upon the Bureau of Land Management to prepare a supplemental EIS. The other significant issue is that having realized that this project was having far greater impacts on desert tortoises, the government should have rolled up its sleeves and taken a careful look at two alternatives which involved far less environmental harm. That is the Ivanpah Dry Lake Bed Alternative and the Harper Lake Alternative. As explained in our briefs, both were available for this project, but the Bureau of Land Management in the EIS rejected them from the outset on the grounds that the Dry Lake Bed Alternative might pose the expense of diking and speculated that the cost of diking that area might be prohibitive, but there was no analysis as this court found lacking in the SEAC versus Federal Highway Administration case where this court took the Alaska Department of Transportation and the Federal Highway Administration to task for preparing an EIS which listed, I think, ten alternatives, all of which involved considerable expense and included construction of a roadway north of the end of the current highway north of Juneau up the east coast of Lynn Canal, which, as you know, is a very treacherous area. In that case, there was a submission by somebody else that indicated there was an alternative that had not been explored that would not have those cost factors. Is there anything like that here? Well, in this case, Your Honor, we have the suggestions from the public of the Ivanpah Dry Lake... I mean, the notion that diking is expensive isn't a remarkable notion. Well, it's not a notion that suggests that the cost of that alternative versus the cost of the huge mitigation for desertorists involved with the project alternative is excessive. Bear in mind the Ivanpah Valley is split by I-15. It's elevated. There is an electrical transmission line that passes through that same valley bottom which is variously called the Ivanpah Dry Lake bed. So we already know that other facilities are doing just fine there with a little bit of diking. We also know that the project site itself is subject to flooding according to the EIS. I just don't see why they would even have to look at the diking beyond considering the possibility and looking at the cost since it appears that there isn't any significant impact on the species. And it looks like the way you're getting around that is by saying, but there's a big impact on the species in this, what was it, five acres or something like that or some small area within the habitat of these tortoises. It's kind of like saying that the critters on my land are a special species because they're on my land and the species that are identical on my neighbor's land don't really count. Well, in answer to those questions, Your Honor, if I might explain, the reason that the Ivanpah Dry Lake bed alternative looms so large as an appropriate alternative is that it doesn't involve destruction of any vegetation or habitat for the desert tortoise. And it's immediately adjacent to this project. It's certainly closer to Interstate 15 and easier to develop. It's flatter and so forth, so it's less expensive. Secondly, with regard to the significance of clearing off the... It looks as though the reason they picked this spot for the solar energy project was the particular terrain and location of the mountain and so forth were good for focusing sun in order to create solar energy. I think that's a misunderstanding with all respect, Your Honor. That site, actually, the dry lake bed is pretty level, pretty flat. As you get to the northwest of I-15, it slopes up gently but steadily to the Clark Mountains on the west and another range on the north and that becomes increasingly irregular terrain. I'm at a disadvantage here because I didn't find the map in the excerpts. Is there a map that shows me what you're talking about so I can follow it? I apologize, Your Honor. I don't have in mind the page, but I know that the EIS does have vicinity maps which depict the location, but the area is not five acres. The area is 5.4 square miles. Square miles, yes. It's a pretty substantial area, well over 3,400 acres. We're talking about an area which is located uniquely at a high elevation next to relatively untrammeled wilderness areas in the Clark Mountains. It's a good refugium for the desert tortoises to survive the onslaught of global warming and it's relatively untouched. Now, the other alternatives would not have posed that kind of a neural impact. The thing about it is it's five square miles in the Nevada desert. It happens to be five square miles real close to some outlet malls and a town. There's a whole lot of Nevada desert nearby that also has plenty of these desert tortoises as far as I can tell. Why does some impingement in this five square miles require the bearing of greater expense? I think actually, well, in answer to the question, it requires compliance with NEPA which says, and the cases hold, that when there are alternatives that pose less environmental impact, they must be examined and there must be a reasoned analysis of their costs and benefits relative to the proposed project in order to exclude them. In this case, there was no economic analysis. It was similar to the SEAC case in that the government just brushed that alternative aside without conducting any analysis of what would be the cost and feasibility of diking. I think what the government concluded here is there would be no significant impact on the desert tortoise population. Actually, the government concluded that this project did involve potentially significant effects on the desert tortoise. That's why an EIS was prepared. And then the government mistakenly told the public that only up to 50 tortoises would be taken when, in fact, the number could be as high as 1,136, according to the Fish and Wildlife Service. If you want to look at the unhatched eggs. I don't think it's a laughing matter. The 1,136. Because without the eggs, you don't have the hatchlings and so forth. It is a laughing matter. That comparison is apples and oranges. It's not 50 versus 1,000 and some. 1,000 and some aren't going to produce that many adult tortoises. Okay. Counsel, it's a laughing matter because you're taking 1,136 for unhatched eggs, many of which will never hatch, and hatchlings, which, according to the studies here, about 95%, not 90%, as you said, never grow to sexual maturity. So what you're doing is comparing a number to another number in a way that shows the significance of the two incongruent numbers. Well, the Fish and Wildlife Service would probably beg to differ because they think it's important, and they use those figures. However, they also were careful to divide the age classes up into different components, which we did in our brief, and I can refer the court to it. No, they didn't. They said 50, and then it turned out it might be something over 100 because they're hard to count, but not over 1,000. The Fish and Wildlife Service in the 2011 Biological Opinion, Your Honor, stated that the development of Units 2 and 3 of this project would kill or injure between 178 and 668 non-hatchling desert tortoises smaller than 160 millimeters. So these are juveniles. They're not hatchlings. They're not eggs. It also indicated that as many as 139 desert tortoises beyond the age of 15 and beyond 160 millimeters would be killed or injured with the project. And then it added a third category, which is between 88 and 329 desert tortoise hatchlings or eggs would be destroyed. So we were careful in the brief, and the Fish and Wildlife Service was careful in its biological opinions to explain these different age classes that would be lost. So even if the court is of the mind that eggs are subject to mortality over time to sensibly include in the calculus, nonetheless, the other age classes surely bear careful attention, just as if one were examining the health of a community in human society, one would not discount populations of schoolchildren. They would be entitled to enhanced concern because they are the future, and so too here. I think the Solar Project did start a nursery for the tortoises, a kind of Montessori school for the hatchlings they found. Well, they actually killed almost all of them, and there were a few that survived that initial clearing process. And we know from the only comparable mass translocation effort that has been made in the last several years, that by the army at the nearby Fort Irwin, which is located over the Clark Mountains to the west, that there, 22% of the translocated tortoises died within year one, 45% died by year three. If you follow that projection in the future, that's not a bleak prospect for those few 30-some tortoises who were penned up by Bright Source during the clearing process. So we are talking about basically a mass extermination of desert tortoises and their habitat in a very important area of habitat for them. The last thing I see, I'm almost out of time, I wanted to reserve some rebuttal and also mention that this project ignored impacts on birds, and we have discussed that in our brief. Okay, thank you, your honors. Thank you. I see there are two of you there. Before we start the clock, let me inquire as to whether there's a plan to divide time. Yes, there is, your honors. I plan to take 13 minutes and hopefully save 7 minutes for Mr. Furlow, who represents the intervenors. Good morning, your honor. May it please the court, my name is Tecla Hanson-Young and I represent the United States. With me at counsel's table is Mr. Al Furlow, who represents the intervenor company. This case involves multiple NEPA challenges to BLM's approval of four rights of way, which then ultimately resulted in the construction of the solar power plant. In this case, the Ninth Circuit has already rejected Could you address consideration of alternatives? Yes. BLM considered 23 alternatives in its environmental impact statement, including both the alternatives that issue here, the dry lake bed alternative and the private lands alternative. BLM rejected the dry lake alternative for several reasons, not just the cost reasons that Mr. Volker discussed here today.  And it would not only have been costly to dike the area to make it feasible to construct the plant there, but it would have been costly to do so. The other significant reason why the agency rejected that area as an option for building the power plant was because the area is used for land sailing. It's a hugely important area for recreation and the agency has discretion to make decisions about how it prioritizes land use in certain areas. That's discussed on page 877 of the excerpt. The agency also rejected the private lands alternative because it was speculative. It would have involved a negotiation and purchase of land from over 70 owners and it would have been inconsistent with the government's desire to fast track this energy project. In addition, that private land alternative would have had the same or very similar environmental impacts as the alternative that was chosen here because the private land alternative was also located in desert tortoise habitat. So it wouldn't have made a difference as far as impacts on desert tortoises go. Just for my information, was that a general private land alternative or was that a specific private land that was being considered? It was both. There were specific parcels of land that were under consideration for potential purpose. And was this in this high elevation area also? My understanding is that it was very near to where the project is currently located. I would also like to point out that while this habitat is unique because it's in a higher elevation, it was also categorized as the lowest kind of quality habitat for desert tortoises. There was Category 1, 2, and 3. This was classified as Category 3. And it also makes up less than one-tenth of one percent of the habitat available in the recovery unit. There's 4.8 million acres of desert tortoise habitat in the recovery unit. This is substantially less than 5,000 acres. This area is close to the town and the outlet malls and that sort of thing. There is also a lot of development in the area already, and that was discussed in BLM's discussion of fragmentation impacts. There's the golf course, a casino. I-15 transects the area. And so there's already a substantial amount of development making this area more suitable than other areas would be. While I'm on the topic of fragmentation, I also want to point out that the agency discussed in the Record of Decision, which was in response to comments that Western Watersheds and other plaintiffs made in the EIS process, that there would still be three corridors open to maintain connectivity between the areas around the project. And also it's worth noting that desert tortoises need live-in connectivity zones because they move quite slowly. So it's not like a deer or another fast-moving species that just needs a corridor to move quickly through. They need wider zones that they can live in. And the project would preserve three such areas, although two are more likely than three. I also wanted to pick up on something that your honors were discussing earlier, which is the EIS focused on the adult populations for several reasons, but the most important reason is because the number of adult tortoises is an indicator of a stable population. And that's discussed on ER 2612 in the 2009 Biological Assessment and in 1897 in response to comments. Tortoises lay eggs every year. Female tortoises lay an average of nine in each clutch, and they can have up to three clutches per year. So it's not like other long-lived species like sharks or whales that produce very small amounts of young. They produce a lot of eggs because, as your honors pointed out, most of them die, 98% of them. And the hatchling rate is about 50% is what some of the estimates were discussed in the biological opinion. And so Fish and Wildlife Service and BLM actually provided in the take statement that all of the juveniles and eggs that were in the project area could be taken, could be killed, and there would still be very minimal impact on the population stability because, as I said... So what you're saying is regardless of the significance of the additional information about eggs and juveniles, the original consideration itself said, when you're talking about this low percentage of land that's being involved, that there would still, even with... You wouldn't have this. Yeah, even assuming all of the juveniles and eggs would be lost as a result of the project, there would be a very minor impact on the population because the population is small and because it would be consistent with what would happen... And that conclusion wouldn't be affected by the later information with respect to the eggs and... That's correct. There is no... The information concerning the additional tortoises found on the project did not change the nature of the project or the nature of its impacts in any significant way. So supplementation was not required. And Western Watersheds hasn't actually demonstrated why the increased number would have made a difference on the population or disputed the science that the Fish and Wildlife Service used in putting the information out there or disputed BLM's analysis and the determination of NEPA adequacy. So once the Fish and Wildlife Service issued its 2011 biological opinion addressing these revised estimates, BLM went back and looked at that information and determined whether it needed to supplement its NEPA and... So it looked at it. You're saying that this was the hard look. That's correct. And it determined that it did not need to supplement its NEPA analysis. Importantly, I would like to note that Western Watersheds hasn't demonstrated to the court what information it would have liked to put before the agency that it didn't have an opportunity to do so because it wasn't able to participate. It asserts it wasn't able to participate, but it doesn't show how it was unable to participate or why that would have mattered. In other words, if there was something lacking, it's not clear what that was or how that would have made a difference for the agency's analysis. Am I correct in understanding, incidentally, that part of the project consisted of finding adult tortoises and relocating them to similar desert outside the solar energy project? Yes, you are correct. That was the Desert Tortoise Translocation Plan. My understanding is that approximately 90 adult tortoises were found on the site and translocated, and this is now moving into some extra record information. I don't know if the court is interested in that, but my understanding is that the... Let me back up. Part of the Desert Tortoise Translocation Plan involved continuous monitoring for several years after the tortoises were translocated. So the desert tortoises were to be translocated to an area that was found suitable, and then their mortality rates were to be monitored. They were equipped with radio transmitter signals, and their mortality rates and behavior was to be monitored and compared to two control populations and to the tortoises that were already residing in the translocation area. And the agency and the company have continued to monitor, my understanding... Are they being transported to a high elevation area also? I believe it's in an area north of where the project is located. But we don't know. I mean, we don't know whether the high elevation desert tortoise stays that way if it changes its habitat. No, but frankly, Your Honor, I'm not sure why that matters. If the habitat is suitable... Well, I'm just interested for my own purposes whether... What the elevation is. Yeah, and whether you can transfer turtles back to a high elevation area that come from a different non-high elevation area. Well, all indications is that the level of mortality rates for the translocated tortoises is the same as for the resident population and the control group. That means you check on the tortoises after you move them, and they're still doing about the same? That is correct. They send out... They conduct exhaustive surveys to check on the status of the translocated tortoises with radio transmitting devices that pick up on their frequency. They go out and try to find them... So they can find their individual tortoises? And figure out how they're doing. So they actually go and inspect and check on all the translocated tortoises. Could you help me with something? It just keeps bouncing around in the back of my mind. Sure. And you've got to help me get it out. I keep thinking, suppose we said, No, no, they didn't take a hard look. And we send it back to the district court. This project's already done. What is there left to accomplish? You're already making the solar energy, and the sun is shining onto the mirrors, and whatever's going to happen to the tortoises on account of it looks like it's already happened. What's left? What could happen? What remedy could we provide? We would submit that this case is likely moot. However, the Ninth Circuit's case law is very difficult on this issue. That's a polite word. If Your Honor would like to, and we think that some of the claims are more clearly moot than other of the claims. I want to know practically what could we accomplish by saying, You did a bad job. Do it over. I agree with you. It's really hard to figure out mootness under our current... Practical matter. There's very little that can be accomplished, and here is why. You are right when you note that the project has already been built, and the agencies are implementing the post-project. The agencies and the companies, including the state agencies, are complying with post-construction mitigation procedures, studying the impacts on tortoises. The Head Start, and Mr. Furlow will talk about this in more detail. Head Start, not the story. The Head Start program, yes, is operational, and I believe it has actually been quite successful with an extremely low mortality rate for juveniles and hatchlings as compared to what is in the wild. So there's some indication that this project actually did better by the juvenile and eggs than what would have naturally occurred. Also, we haven't addressed the bird claim that Mr. Volker discussed, but there was also an avian monitoring plan that was developed and put into place, and the agency and the company are currently studying the impacts of the project on birds and bird mortality and implementing various measures to try to reduce that mortality over time, and that is ongoing. The first annual report has not been approved yet by the federal agencies, so it's not...I can't speak to the contents of it with confidence, but that is underway as well. So there's very little practical effect or practical benefits that would be accomplished by a remand. The project's already been built, and the agency is continuing to study and monitor the project's impacts. The agency retains authority under the right-of-way to impose mandatory mitigation measures, impose additional mandatory mitigation measures both for tortoise and birds, and it will do so if there's an indication that it is necessary to do so. I would like to reserve the remainder of my time for Mr. Furlow if this court has no additional questions for me, but I would also like to point out the Ninth Circuit has addressed this case twice before, and there is no reason to depart from those in an emergency... rejecting an emergency motion for an injunction pending appeal, and in denying...affirming the district court's denial of a request for a preliminary injunction. There's no reason to depart from those prior rulings here. Thank you. Thank you. Mr. Furlow. May it please the court, Albert Furlow representing the project sponsors. I have a representative from the project sitting here in the audience, Mr. Ray Kelly. He's here observing the argument today. I just want to raise or address briefly two points that I think I'd like to amplify on that were discussed earlier. As far as the number of tortoises, this is a case where the court's being called upon to review the EIS that was produced. There was a draft EIS, a supplemental draft EIS, and a final EIS. In those documents, the agency determined that up to 50 adult tortoises could be at the site. That number was not a guess. It was not a supposition on the part of the agency. It was based on two surveys that were conducted prior to the publication of the EIS. The surveys were approved and reviewed by BLM. The surveys were approved and reviewed by the Fish and Wildlife Service. That was the state-of-the-art knowledge of the number of tortoises on the site at the time the EIS was published. It was not until the project started its construction process and discovered that in doing it was a phased process. There are three units, Unit 1, Unit 2, Unit 3. As we were doing Unit 1, it was discovered that there were more tortoises there than we had anticipated. If the same number of tortoises were found in Units 2 and 3, we would be beyond the number of tortoises that were included and analyzed in the biological opinions done by the Fish and Wildlife Service. So the project requested to BLM that that information be now reviewed and processed through the Endangered Species Act consultation process. Plaintiffs had an issue in the district court addressing the Endangered Species Act. They dropped that on appeal. As a result of that analysis, it was determined that there could be more tortoises on the site. That information was then incorporated and reviewed by BLM in its determination of NEPA adequacy to determine whether or not there needed to be a supplement to the environmental impact statement. The review of the information, and this was thoroughly discussed and I won't go into it again, but it was determined that the greater number of tortoises doesn't really matter insofar as the impacts to the tortoises and the species itself. So the determination was made at that point in time that that information in and of itself did not require a supplemental EIS. It was finding the larger number of tortoises, I sort of wonder if that was a good thing or a bad thing. It was a bad thing from the perspective of having to do additional studies, but is that reflective of simply the difficulty of identifying the number of tortoises so that the populations elsewhere may be larger? Is it something unique to the site? Do we know what that count reflected? Well, I think, Your Honor, you'll find in the... There's a reference in my brief to language by the Fish and Wildlife Service that indicated that finding these tortoises is really hard. I think they characterize it... They are a cryptic species, which I thought was sort of a... Well, they're probably better off not calling attention to themselves. So it's not a surprise. There's not that much they can do other than retreat into their shell when they're older. When they're younger, as the court has recognized, 95% to 98% of them are killed. They're eaten by ravens. They're eaten by foxes, coyotes, whatever is out there. In fact, some eggs we've experienced in our Head Start program, which will be my second topic, some of the eggs that were found and that were in the Head Start were actually attacked by fire ants. Fire ants found the eggs to be a good source of protein, I guess. So we've had difficulties dealing with that. But the natural mortality of these tortoises is quite high. And I agree, Your Honor, finding more, one of the reasons why the estimate was higher, a couple of reasons, one was based upon a very thorough search for tortoises prior to construction where you basically had lines of biologists spread out. This project has been a biologist's full employment act. But these biologists were spread out on transects and actually every step looking for tortoises on the site so that we could be as sure as we could, given the cryptic nature of the species, that when the construction took place... What happens under the construction? Tears up vegetation and turns up burrows so that you discover more? They're hiding from the ravens and then their burrow is opened up by the construction? Well, the burrows, to a large extent, finding the adults is relatively easy because they're large enough to be seen. And it's the smaller ones where the assumption was that we wouldn't find any and that they would all be killed. That proved not to be true. We were pretty successful in finding the smaller tortoises and those that we found were put into the Head Start program. We wound up in this Head Start program, which was actually... It's a series of pens that were set up, covered to protect them from ravens, food purchased from Whole Foods so that they would have the proper diet. And these tortoises... Whole Foods? You don't go to Ralph's? They went to Whole Foods. They didn't ask me. They decided that... Well, the biologist said that we had to go to Whole Foods and that was the only place to find the proper feed. But we had approximately 115 tortoises in the Head Start facility. We're hoping to release within a year because it's been almost five years and they're now growing. We hope within a year to release around 99 or so back out into the wild in the areas that have been identified for the translocation. Looking at that number and taking the high range of what was estimated to be the impact to juveniles and eggs by the Fish and Wildlife Service after the NEPA document was produced, we're introducing close to 10% of the population that was estimated to be there back into the wild in a much better position to survive to adulthood. So this is a project... Hold on, you're releasing... You pick up these juveniles. More than 90 or 95% of them would die in the wild. You put them in your Head Start program and then you release back adults who are 10% of which population? The population that had been estimated to be destroyed or otherwise harmed by the construction of the facility itself. If you have a 90% death rate among the juveniles, that would mean you get just as many tortoises after the project as before, if I understand this. That's exactly right, Your Honor. In fact, the Fish and Wildlife Service in the biological opinion noted that by doing this, we might actually have a better situation than might have existed had nothing been done. So there may be more tortoises because of Head Start and food from Whole Foods and protecting them from ravens and all that. That's right, Your Honor. That's right. Those are really the two points I wanted to make. The discussion of the alternatives, for NEPA purposes, to reject an alternative, the case law and the CEQ regs, it's noted in my brief, only require the agency to describe briefly the reasons for not carrying those alternatives forward. In this case, for the two alternatives that have been raised by the plaintiffs, there are several pages of explanation as to why those alternatives aren't carried forward. So to the extent that those alternatives have been reviewed, they've been assessed, they've been rejected, and from a practical, getting to my final point, getting to the practicalities of this situation, going back and doing additional study, which is really the remedy for NEPA, the information is out there now. All we would be doing is producing studies or putting out for public comment studies that have already been done on a project that has been functioning now and producing electricity for close to a year. I think we have your point. Thank you, Your Honor. Unless you have any other questions? No. Thank you. Mr. Volker, we let the defendants go three minutes over, so you'll get an extra three minutes as well. I'm sure you have some things to say. Well, the bottom line is that this area is unique by virtue of the fact that it's the highest elevation population of desert tortoises in California. They're uniquely acclimated to this location. The project has displaced them, killed almost all of them. The few that remain will be translocated somewhere. The government would have the court believe that they will be translocated to areas in which they will thrive. The reality is quite different for two reasons. First, the two areas that were proposed for translocation are to the north and to the west of this site. The areas to the north are now being developed for two other large industrial-scale solar projects. The first solar state line project and the silver state project are going in immediately north of Phase 3, all the way up to where the mountain range begins. So that's not a translocation option anymore. To the west, we have the Desert Express Railroad line going through. There's very little room remaining for any translocation. As the court undoubtedly is aware, nature abhors a vacuum. If you place a translocated individual in an area that's already occupied by desert tortoises, there will be a fight to the finish, and either there will be new disease interposed by the new exotic or invasive... and they took blood tests, and they check on Alma the tortoise and each individual relocated tortoise. That's not in the record, and I'm not sure where that's coming from. What is in the record is that... I thought I saw it in the environmental index. That's what they're proposing to do, Your Honor, as part of a translocation plan that is being implemented, and perhaps some of these individuals will survive. But by and large, the only large-scale study ever done was at Fort Irvin, as I related. We had 45% mortality within 3 years there. Now, the court asked a very good question. Even if we assume that you're correct, those alternative sites were considered, perhaps not to the extent that you would suggest they should have been, but they are considered, and there was a rationale given as to cost and recreational use for one, and the other one, there was other considerations. So, I mean, even if you're correct, they don't have to be right. They just have to look at it right and consider it. But under SEAC and other leading Ninth Circuit cases, there has to be a reasoned analysis based on fact, not simply a one- or two-line conclusory speculation that this might be too costly. And that's what we have here, is that it said it might be too costly, but we don't have any economic analysis to suggest that that's correct. Now, I was going to move on to what the court had asked, which is, what's the point of all this? If it's already been built, so what? It's too late to fix it. But in fact, the government did wisely reserve continuing authority to require further mitigations, further monitoring, further adjustments in how the project is conducted based on further analysis. Should this court remand this matter, it would have the salubrious effect of directing the government as to how it should properly conduct these environmental abuse. Specifically, there are two points here. One is, the avian impacts are far worse than the government had acknowledged. They seem to be worse than the McCrary study, which we had commented on and had argued in the trial court should have been considered. That study, which was a similar solar thermal power plant with the heliostats, with the tower powers, that killed nine birds per megawatt per year. Scaled up for this project, that's 3,330 birds killed per year. And we need to solve that problem because we can't have an endless stream of birds going across the 5.4 square miles only to be incinerated. They have no escape before they know it. Their feathers are torched. So we need to solve that problem. The best way to do that is to remand this to BLM and say, lookit, the McCrary study was actually very helpful. It involved a similar type of technology in a similar area, and it yielded information showing there would be not only the collisions with the heliostats, but more importantly, the incineration effects. So we need to figure out how to, whether there's a way to persuade birds not to use an area, to put this in an area where there aren't as many birds, or to say, we're going to sunset this technology because it's simply too prohibitively costly in terms of its environmental impact. It's probably in violation, for example, of the Migratory Bird Treaty Act because of the massive scale of the loss of bird life. Now, I would urge the court to take a careful look at the briefs on this issue. I think you'll find it's a pretty persuasive case for a remand on that. As for desert tortoises... I think everybody knows you're right about alternative energy projects, windmills and solar, having a substantial negative impact on birds. We hardly need studies and expansions of environmental impact statements to tell us that. The windmills kill bald eagles all the time. The solar energy will undoubtedly kill birds that bump into the towers, as you've just said. But isn't that just a government policy decision about whether to have these alternative energy projects and subsidize them? It is a government policy decision that, under the law, must be fully informed by adequate environmental review, which did not occur in this case. There are photovoltaic cell technologies that don't involve superheated beams of energy passing through the sky and incinerating birds. There is rooftop solar, which cuts out the middleman, delivers energy directly to the energy demand centers in the urban areas at much less cost, environmental as well as economic, and is a complete substitute for this kind of misadventure. And I would suggest to the court that it would behoove the government to broaden its horizons. That was, after all, the original purpose of NEPA, was to generate information so that Congress, as well as the agencies, would be better informed in making good decisions. It's heartening to hear the court's concern about avian mortality. It's absolutely important to examine that, and this court is uniquely situated right now to take a close look and direct the government to conduct a more thorough, comprehensive analysis of alternatives and just better ways to do these projects so that we avoid global warming, we avoid the needless effects, the external impacts on bird life and other wildlife. Thank you very much for your time. Thank you. Thank all counsel for your helpful comments. The case just argued is submitted.
judges: Kleinfeld, Benavides, Clifton